

RECEIVED

APR 1 3 2017

Clerk, U.S. District and
Bankruptcy Courts

### UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
*ex rel.* KARL MEINBERGER,

and

UNITED STATES OF AMERICA,
*ex rel.* WIDO WEBER,

                    **Plaintiffs,**

    v.

EMIRATES,

                **Defendant.**

Case: 1:17-cv-00655      **JURY DEMAND**
Assigned To : Collyer, Rosemary M.
Assign. Date : 4/13/2017
Description: Gen. Civ. (Other)      **(E-DECK)**

<u>Jury Trial Demanded</u>

**Filed Under Seal**
31 U.S.C. § 3730(b)(2)

---

### COMPLAINT
Claims Pursuant to the False Claims Act, 31 USC sec. 3729, et seq.

---

The United States of America, by and through *qui tam* originating relators Karl Meinberger and Wido Weber ("Relators" or "Meinberger and Weber"), hereby bring this action pursuant to the False Claims Act ("FCA"), as amended, 31 U.S.C. § 3729 *et seq*., by and through their attorneys, Brian H. Mahany of Mahany Law, and David P. Weber,[1] Goodwin Weber PLLC, and hereby declare the following to recover all damages, penalties, and other remedies available as established by the FCA which were caused by Defendant's repeated and deliberate falsifying of documents and misrepresentations on following required safety regulations for international flights awarded under the GSA City Pair Program. Defendant deliberately violated safety regulations by requiring pilots to work longer than allowed hours and by denying them sufficient rest on all flights, including when performing on the GSA City Pair Program contract.

## I. THE PARTIES

1. The United States of America is a Plaintiff in this action.

2. Plaintiff-Relator Wido Weber is a former Emirates Airline Senior First Officer B777 from January 2012 through January 2015. He is currently living outside of Munich, in Ingolstadt, Germany.

3. Plaintiff-Relator Karl Meinberger is a former Emirates Airline Captain A380 from September 2009 through October 2015. From September 2005 through September 2009 he was First Officer on A330/A340 for Emirates. He is currently living outside of Munich, in Tutzing, Germany.

4. Defendant Emirates is an airline based in Dubai, United Arab Emirates. The airline is a subsidiary of The Emirates Group, which is wholly owned by the government of Dubai's Investment Corporation of Dubai.

---

[1] Undersigned counsel David P. Weber is not related to Plaintiff-Relator Wido Weber.

5. The Emirates Group is a Dubai-based international aviation holding company headquartered in Garhoud, Dubai, United Arab Emirates, near Dubai International Airport. The Emirates Group comprises Dnata, an aviation services company providing ground handling services at 17 airports, and Emirates Airlines.

6. Emirates operates several flights in and out of the United States, has offices located in the United States, and has registered its business in New York.

7. Emirates flies to the following United States locations as of January 2017: Boston Logan International Airport; Chicago O'Hare International Airport; Dallas/Fort Worth International Airport; Fort Lauderdale-Hollywood International Airport; Houston George Bush Intercontinental Airport; Los Angeles International Airport; Newark Liberty International Airport; New York City John F. Kennedy International Airport; Orlando International Airport; San Francisco International Airport; Seattle–Tacoma International Airport; and Washington Dulles International Airport.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3730(b), and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Further, the United States is a Plaintiff. 28 U.S.C. § 1345.

9. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendant transacts business in this District.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because the Defendant transacts business in this District.

11. Relators have standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

### III. APPLICABLE LAW

A. **The False Claims Act**

12. The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

13. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

14. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

15. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

3

16. Private citizens, such as Meinberger and Weber, are allowed to bring actions on the government's behalf. "(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C.A. § 3730(b)(1).

17. Under 31 U.S.C. § 3730(e), there has been no statutory relevant public disclosure of the allegation or transactions in this Complaint with respect to which Plaintiff-Relators Meinberger and Weber are not an "original source," and all material information relevant to this Complaint was provided to the United States Government prior to filing his Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B).

18. Relators have direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and must be considered to be the original source of any information that is in the public realm.

19. Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and have knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims.

### B. United Arab Emirates General Civil Aviation Authority

20. The General Civil Aviation Authority (GCAA) was established in 1996 by UAE Federal Cabinet Decree (Law 4) to regulate Civil Aviation and provide designated aviation services with emphasis on safety and security and to strengthen the aviation industry within the UAE and its upper airspace.

4

21. Subpart Q is part of CAR-OPS 1 of the GCAA regulates Flight/Duty Time Rest Requirements: No person shall act as an operating crew member of the flight crew of an aircraft if at the beginning of the flight the aggregate of all his previous flight times; (1) during the period of 28 (twenty eight) consecutive days expiring at the end of the day on which the flight begins exceeds 100 (one hundred) block hours: or (2) during the period of 12 (twelve months) expiring at the end of the previous month exceeds 900 (nine hundred) block hours. CAR-OPS 1.1125(a). The maximum cumulative duty hours for Flight crew of an aeroplane shall not exceed; (1) 55 hours in any 7 consecutive days, but may be increased to 60 hours, when rostered duty covering a series of duty periods, once commenced, is subject to unforeseen delays. (2) 95 hours in any 14 consecutive days; and (3) 190 hours in any 28 consecutive days. CAR-OPS 1.1125(b).

22. It also regulates duty cycle and days off: **A Crew member:** (a) shall not be on duty more than 7 consecutive days between days off, but may be positioned, and may operate only, under unforeseen circumstances, to the usual operating base on the eighth day, provided they are then allocated at least 2 consecutive days off, and (b) shall have 2 consecutive days off in any consecutive 14 days following the previous 2 consecutive days off, and (c) shall have a minimum of 7 days off in any consecutive 28 days, and (d) shall have an average of at least 8 days off in each consecutive 28-day period, averaged over three (3) such periods. CAR-OPS 1.1126.

23. The GCAA also regulates Emirates with an Operations Manual specific to Emirates. In this operations manual, there are several provisions which Emirates violated, as described below.

24. The GCAA limits the amount of hours for Flight Duty Hours. The Maximum Allowable FDP (in hours) is determined from the appropriate use of the following tables by entering with the

local time of start of the duty and the number of sectors planned (actual sectors flown in the case of re-planning). (Emirates Operations Manual – Part A 7.6.2 (Revision 12, Effective July 21, 2016) (hereafter "OM-A")).

**OM-A 7.6.2.1 Two or More Flight Crew – Acclimatised**

| Local Time | Number of Sectors | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 or more |
| 0600-0759 | 13 | 12¼ | 11½ | 10¾ | 10 | 9½ | 9 | 9 |
| 0800-1259 | 14 | 13¼ | 12½ | 11¾ | 11 | 10½ | 10 | 9½ |
| 1300-1759 | 13 | 12¼ | 11½ | 10¾ | 10 | 9½ | 9 | 9 |
| 1800-2159 | 12 | 11¼ | 10½ | 9¾ | 9 | 9 | 9 | 9 |
| 2200-0559 | 11 | 10¼ | 9½ | 9 | 9 | 9 | 9 | 9 |

**OM-A 7.6.2.2 Two or More Flight Crew – Not Acclimatised**

| Local Time | Number of Sectors | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 or more |
| Up to 18 hours or over 30 hours | 13 | 12¼ | 11½ | 10¾ | 10 | 9¼ | 9 |
| Between 18 and 30 hours | 11½ | 11 | 10½ | 9¾ | 9 | 9 | 9 |

**CAUTION:** It is not permitted to insert a short duty into a rest period of between 18 and 30 hours in order to produce a rest period of less than 18 hours in order to take advantage of the longer FDP available

6

25. The GCAA regulates Late Finishes/Early Starts. Sleep deprivation, leading to the onset of fatigue, can arise if a crew member is required to report early for duty, or finishes a duty late, on a number of consecutive days. Therefore, not more than 3 consecutive duties that occur in any part of the period 0100 to 0659 local time can be undertaken, nor will there be more than 4 such duties in any 7 consecutive days. Any run of consecutive duties (Late Finishes or Nights or Early Starts) can only be broken by a period of not less than 34 consecutive hours free from such duties. The local start time of the first duty which commences within 24 hours following the start time of the first rest period taken in a place which is in a time zone 1 hour different to home based local time will, for flight time limitation purposes, be deemed to be the same as home based local time. However, crew members who are employed on regular early morning duty for a maximum of 5 consecutive duties will work to the following: a. The minimum rest period before that start of such a series of duties is 24 hours. b. The duty will not exceed 9 hours, irrespective of the sectors flown. c. At the finish of such a series of duties, crew members will have a minimum of 63 hours free of all duties. At the roster planning stages the Company may roster crew members for either 2 or 3 consecutive nights, but must ensure that the duty proceeding this series of duties finishes by 2359L (2 nights) or 2100L (3 nights) as appropriate. OM-A 7.9.1.

26. The GCAA regulates night duties. Should any duties be scheduled to be carried out within any part of the period 0200 and 0459 local time, for 3 consecutive nights, then crew members will finish the duty preceding this series of duties by 2100 hours local time before covering the block of consecutive night duties, such that crew members can take a rest period during a local night. If the duty immediately prior to the 3 consecutive night duties extends beyond 2100 local time and the individual crew member is willing to continue with the planned

7

roster (i.e. 3 consecutive night duties) then provided in the duties preceding this series of duties finishes no later than 2359 hours, the schedule may continue. If the crew member chooses not to continue the planned roster (after finishing duty between 2100 and 2359) then only the planned first and second night duties that impinge on any part of the period 0200 to 0459 local time may be undertaken. If the duty finishes after 2359, then only the first of the 3 consecutive night duties that impinge on any part of the period 0200 to 0459 local time may be undertaken. OM-A 7.9.2. The following restrictions apply to Late Finishes, Early Starts and Night Duties. a. The exercise of "Commander's Discretion" to extend a duty is limited to 1 hour per day with a total of 2 hours allowed during any 5 consecutive early morning duties cycle; b. "Commander's Discretion" to reduce rest is not permitted; c. Split duties are not permitted. OM-A 7.9.2.2.

27. The GCAA sets limits on two flight crew long range operations. When the flight crew consists of only two pilots, the allowable FDP shall be modified as follows. Where a sector is scheduled for more than 7 hours, it is to be considered as a multi-sector flight as in the following table: The appropriate table in Section 7.6.2 is then entered with the start time of the duty period and the 'factored' number of sectors, to determine the allowable FDP. Note: When any additional current, type rated pilot is a crew member, these limits do not apply and the permissible FDP is determined by entering the Table in Section 7.6.2.1 or 7.6.2.2 as appropriate with the time of start and the actual sectors planned. OM-A 7.9.3.

28. The GCAA regulates minimum rest periods. The minimum rest period for flight crew that will be provided before undertaking a flying duty period will be the greater of a. or b. below: a. At least as long as the preceding duty period; or b. 12 hours. OM-A 7.16.1.

29. The GCAA regulates days off. Wherever possible, days off will be taken at home base. A single day off shall consist of 2 local nights, and will last at least 34 hours. A planned rest period may be included as part of a day off. A crew member: a. Shall not be on duty more than 7 consecutive days before a minimum of one day off is assigned; b. Shall have 2 consecutive days off in any 14 consecutive days following the previous 2 consecutive day off; and c. Shall have a minimum of 7 days off in any consecutive 28 days; and d. Shall have at least 24 days off in any consecutive 84 days period. A crew member may position or operate to home base on the eighth or thirteenth day with approval of SVP-F or his designee. He shall be given an additional day off immediately following his return to home base. Days off taken away from home base by crew members attending a training course (as a trainee or trainer), meet the requirements of this paragraph. OM-A 7.18.1.

30. The GCAA limits duty hours. The maximum duty hours for flight crew shall not exceed: a. 55 hours in any 7 consecutive days; Note: This limit may be increased to 60 hours when a series of duty periods, once commenced, is subject to unforeseen delays. b. 95 hours in any 14 consecutive days; or c. 190 hours in any 28 consecutive days. When a flight crew member is not rostered for either standby or flying duties for 28 or more consecutive days, then any duty hours worked are not added to cumulative totals. However, when a crew member is anticipated to return to standby or flying duties then the duty hours worked in the 28 days preceding that duty must be recorded. Those hours worked will be used to ensure that the crew member complies with the requirements of this Scheme. OM-A 7.19.1 The following duties are to count in full: a. Duty periods and flying duty periods, plus subsequent post-flight duties; b. All standby duty, except that specified in e. below; c. The time spent on positioning; d. The time spent on office duties by management pilots within a single FDP; e.

The following duties are to count as half the time on duty: 1. The standby duty, when the period of notice given to the crew member before reporting for duty is 1.5 hours; 2. The standby duty, when undertaken at home, or in suitable accommodation provided by Emirates, takes place between the period 2200 to 0800 local time, and the crew member can take undisturbed rest and is not called out for duty. OM-A 7.19.2.

31. The GCAA has absolute limits on flying hours. A person shall not act as a member of the flight crew of an aeroplane if, at the beginning of the flight, the aggregate of all previous flight times: a. Exceeds 100 hours during the period of 28 consecutive days expiring at the end of the day on which the flight begins exceeds 100 hours; Note: On the 28th day, a flight crew member may depart on a single sector flight, and they may complete that sector, even though at the end of the flight the total flying hours completed in 28 days will exceed 100 hours. Consequently, they cannot then continue to operate as a flight crew member on any subsequent sectors during that day. b. Exceeds 900 hours during the period of 12 months expiring at the end of the previous month. Note: The accumulated flight time for any consecutive 12 month period must not exceed 900 hours at midnight local time of the last day of the last calendar month of the 12 month period. Flying hours credited to augmenting crew members for the purposes of calculating the absolute limits on flying hours (for both 100 hours in 28 days and the 900 hours for any consecutive 12 month period) will be based on the actual time in an operating seat, as recorded by the Voyage Report. OM-A 7.20.

32. The GCAA requires specific records to be maintained. Emirates is required to maintain the following records of the duty and rest periods for crew members. OM-A 7.22. a. The beginning, end and duration of each duty or flying duty period, and function performed during the period; b. The duration of each rest period prior to a flying duty or standby duty

period; c. The dates of days off; d. 7 consecutive day totals of duty. Note: With the agreement of the UAE GCAA, since Emirates is a Company employing more than 100 cabin attendants, it need only record the information required above for a percentage of cabin attendants. The size of the percentage and the rate of sampling will be agreed with the assigned Inspector. OM-A 7.22.1. Records required for each flight crew member are daily and 7 consecutive day flying hours. OM-A 7.22.2.

33. The OM-A has Annexes that allow exceptions to the OM-A regulations. Annex C (now Annex E, effective July 31, 2016) has a portion on Rostering Provisions – Flight Crew. The following restrictions are inviolable with regard to the scheduling of flight crew for this plan: a. Prior to operating a ULR flight departing Dubai, all crew members shall be acclimatised. b. All crew members who are scheduled to operate a ULR flight sector may be assigned a ULR Standby on the day before the flight. A crew member may operate a flight prior to the standby period provided that he remains acclimatised and no flight assignment may be made that requires a report prior to 0800 or finishes after 2200 local Dubai time. c. For planning purposes a crew member is assumed to be non-acclimatised upon return from leave and will require 3 local nights in Dubai prior to being assigned a ULR or a ULR standby which commences after 0600 local Dubai time. d. For the day of actual operation a crew member who remains acclimatised during leave is not restricted by c. above. e. A crew member may be assigned a different ULR than that scheduled for the following day but only a ULR flight during the standby period, subject to the provisions of 7.C.10. f. A dedicated Standby crew (when required) will normally comprise of 2 Captains and 2 First Officers. g. A crew member shall be scheduled for a minimum of 3 local nights of rest in Dubai upon completion of a ULR pairing followed by another ULR pairing. h. A crew member shall be scheduled for

a minimum of 2 local nights of rest in Dubai upon completion of a ULR pairing followed by a non-ULR pairing. OM-A Annex 7.E.3 (formerly 7.C.3).

## V. FACTUAL BACKGROUND

### A. Codeshare with JetBlue

34. According to the Emirates website, on May 14, 2013, JetBlue Airways, and Emirates, the Dubai-based international carrier and one of the world's fastest growing airlines, announced their intent to expand their current partnership to include bilateral codesharing, pending FAA and DOT regulatory approval and subject to receipt of foreign government operating authority. Under the expanded agreement, JetBlue will place its "B6" airline code on all flights currently operated by Emirates between the U.S. and Dubai International Airport, as well as between New York's John F. Kennedy International Airport (JFK) and Milan, Italy.

35. The agreement deepens a three-year partnership between JetBlue and Emirates. Emirates started placing its code on select JetBlue-operated flights in April 2012, expanding an interline        agreement        that        dates        back        to        2010. (https://www.emirates.com/us/english/about/news/news_detail.aspx?article=1221373)

### B. City Pair Program

36. The City Pair Program (CPP) offers fares for government employees considerably lower than comparable commercial fares, saving the federal government billions of dollars annually. In 2017, there are eight participating airlines: United, American, Delta, Southwest, JetBlue, Hawaiian, Alaska and new entrant Silver Airways.

37. CPP awarded 9,103 markets in FY17 (6,949 Domestic and 2,154 International), which cover 93% of trips flown by government travelers and 85% of the spend.

38. Utilization of the FY17 CPP is estimated to deliver $2.4 billion in savings to the U.S. Government. CPP fares benchmark 51% lower than commercial like fares with no exchange fees, fully refundable, last seat availability, and no blackout dates.

39. The total CPP FY17 contract value is $1.99 billion and was $1.74 billion in FY16.

### C. City Pair Program Contract Awards

40. The U.S. General Services Administration (GSA) awarded the 2016 CPP U.S. government contract on the Washington-Dubai route to JetBlue. This contract was renewed in 2017 as well.  This contract also applies to flights between Dubai and Dallas-Fort Worth, TX; Los Angeles, CA; and Orlando, FL.

41. The U.S. General Services Administration (GSA) awarded the 2017 U.S. government contract on the New York Kennedy-Milan route to JetBlue.

42. JetBlue had a codeshare with Emirates Airlines for both of these routes where Emirates Airlines ran and is running all of the awarded flights to Dubai and Milan. JetBlue does not operate any of these flights with its own airplanes or crew. Rather, Emirates operates the flights.

### D. City Pair Program fiscal year 2016 solicitation for airline passenger transportation services requirements

43. To bid for the above-mentioned contracts, Emirates certified to the U.S. Department of Defense that it was in compliance with all applicable rules and regulations. From the City Pair Program fiscal year (FY) 2016 solicitation for airline passenger transportation services, known as the City Pair Program, Section K.8 AIR CARRIER QUALITY AND SAFETY

> (a) By checking the box below, the offeror proposing to serve a market through a code share arrangement with a foreign air carrier represents that the offeror has reviewed the foreign carrier's operations and maintenance, and based on that review has determined that the foreign air carrier provides a substantially equivalent level of quality and safety as that provided in the offeror's commercial practice.  For purposes of this clause,

substantially equivalent means that the foreign air carrier's operations and maintenance function largely, but not wholly, in the same manner as the offeror's operations and maintenance. To be eligible for award on international routes, the offeror must make the representation below if the offeror proposes to provide service through foreign code share air carriers.

> [ ] The offeror represents that it has reviewed the operations and maintenance of each foreign code share air carrier to be used by the offeror to provide service under this contract, and based on the review(s) has determined that the foreign air carrier(s) provide(s) a substantially equivalent level of quality and safety as that provided in the offeror's commercial practice.

(b) Prior to contract performance utilizing a code share air carrier, DOD shall review all air carriers proposed as code share partners. If a DOD review of an air carrier proposed as a code share partner has been initiated but is not completed by the beginning date for contract performance, contract performance may proceed unless DOD advises GSA otherwise, in which case GSA may re-award the affected contract line item(s) until such time as DOD approves the code share air carrier(s). The DOD review of U.S. and foreign code share air carriers will be based on the criteria specified in 32 CFR Subparts 861.4 and 861.6, respectively. The 12 month experience requirement at 32 CFR 861.4(e)(1) as provided in 32 CFR 861.6(b) must be met by foreign code share air carriers by the date of contract award.

44. The CFRs in the bidding requirements require that any foreign carrier follow the carrier's homeland country regulations. In this case, Emirates is required to follow the GCAA regulations on all CPP flights. 32 CFR Subpart §861.4 provides that

   i. The quality and safety criteria and requirements set forth in this part complement rather than replace the [Civil Aviation Authority (CAA)] criteria applicable to air carriers. Air carriers normally remain fully subject to applicable CAA regulations (CARs) while performing business for the DOD, even when the aircraft involved is used exclusively for DOD missions.

   ii. 32 CFR §861.3(c) Civil Aviation Authority (CAA). The CAA refers to the organization within a country that has the authority and responsibility to regulate civil aviation. The term CAA is used throughout this part since these requirements are applicable to both U.S. and foreign carriers doing business with DOD. The term CAA thus includes the U.S. Federal Aviation Administration (FAA).

### E.  Fraudulent Conduct

45. Emirates falsely bills the U.S. Government on CPP flights by not following the GCAA regulations regarding crew flight hours. At the time Emirates entered into the bid and

contract with JetBlue and GSA, Emirates knew it violated the GCAA regulations because it had already been violating the regulations for at least the three previous years.

46. Emirates deliberately overworks its flight crews and falsifies documentation to cover up the overworking of crews. Emirates operates its long-haul fleet with significantly fewer pilots per airplane than regulations allow. Aside from the financial fraud, the increased workload and resulting lack of sleep and recovery are a direct threat to crew health and flight safety.

47. The GCAA annual flight time limit for pilots is 900 hours per year (and many U.S. and EU carriers only schedule about 700 hours). On paper, Emirates pilots adhere to the 900 hour limit, but in practice, Emirates pilots reach up to 1,200 flight hours per year.

48. Relators have already reported the following details of Emirates' violations and misbehavior to the FAA and the European Aviation Safety Agency (EASA).

49. Emirates intentionally records false check-in times for all of its pilots on all flights. Because duty-time limits and rest calculations are based on check-in time, it distorts whether an Emirates crew is operating legally. This is not just a problem for individual flights, but also has knock-on effects on subsequent required rest periods, the next legally permitted check-in time, and total calculations for time on duty.

50. Every Emirates pilot is forced to report for duty significantly prior to the legally registered Reporting time. In other words: Emirates is extending its pilots' flight duty times by registering false Reporting times for each and every flight.

51. Pilots' flight time limitations are obviously safety relevant and in the case of Emirates Airline the operations manual is approved by the General Civil Aviation Authority (GCAA) in the United Arab Emirates. According to the Emirates Operations Manual the Standard Reporting

Time for pilots was 1 hour before a flight, until 31-July-2016, Emirates Operations Manual Part A 7.6.1.

52. On paper, pilots were required to report for duty only 1 hour before the flight departed. But the operational reality is very different. The Flight Time should have been calculated when Emirates pilots are picked up at their residences by a company chauffeur and arrive at the Emirates HQ at least 1 hour and 45 minutes before departure. The timing of the company transport is set by Emirates and cannot be delayed by the pilot. The pilot will then proceed through Passport Control and Customs and he will check in his baggage. He will then conduct a preflight briefing with the other pilot on his flight. The flight crew briefing ends at 1 hour 25 minutes before departure as documented in the Flight Crew Departure Timeline. After that the pilots will join their cabin crew and proceed to the aircraft.

53. The pilot has completed all of the outlined tasks at 1 hour and 25 minutes before the flight and yet his reporting time was registered at only 1 hour before the flight. Even Emirates Cabin Crews' Standard Reporting Time is set at 1 hour and 30 minutes but Cabin Crew Flight Time Limitations are less limiting than those for pilots.

54. Here are the details of the sample flight reported to the FAA and the Wall Street Journal in early 2015. It is a 2 Pilot Crew Turnaround. EK 544 and EK 545 Dubai-Chennai-Dubai. B773, A6-EMR on April 25, 2014.

      i.  Pickup by Company Car 00:30 Dubai Local Time

     ii.  Flight Crew Briefing End 01:20 Dubai Local Time

    iii.  Reporting Time 01:45 Dubai Local Time

    iv.  Scheduled Departure 02:45 Dubai Local Time

     v.  Actual Departure DXB 02:57 Dubai Local Time

      vi.   Actual Arrival MAA 06:37 Dubai Local Time

     vii.   Actual Departure MAA 08:02 Dubai Local Time

    viii.   Actual Arrival DXB 12:06 Dubai Local Time

     ix.   Scheduled Arrival DXB 12:30 Dubai Local Time

55. Emirates Airline reported a scheduled Flight Duty Period of 10:45 hours where it was really 11:30 hours. The maximum Flight Duty Period allowed by US Federal Regulation Part 117.13 for 2 Pilot Crew (departing between 0000 - 0359) would have been 09:00 hours.

56. When Relators' provided this information to *The Wall Street Journal* that in turn disclosed this practice in 2015, the GCAA promised to fix the issue, but the false reporting still continues on. After the WSJ reported the issue on April 9, 2015 Emirates removed the "smoking gun", the internal document "Flight Crew Departure Time" from the process (see email from Manager Regulatory Affairs). The flights EK 544 and EK 545 became a layover. But that was the only change until July 31, 2016.

57. Following the fatal crash of FlyDubai flight 981 at Rostov, Russian Federation, on March 19, 2016, Russian and other media reported pilot fatigue issues at both FlyDubai and Emirates. Concerned about bad publicity, Emirates appeared to be more compliant by increasing flight crew check-in times (the time the crew must check in before the flight leaves), effective August 1, 2016. But instead of a realistic and more customary check-in of 1 hour and 45 minutes before scheduled departure, Emirates went from 1 hour up to 1 hour and 25 minutes. This means that the crew is still actually checking in before 1 hour and 25 minutes but not getting credit for that Flight Duty time. And the change only applied to departures from Dubai, not returning flights, such as from New York or London, on which they were still not giving proper credit for check-in times. In short, Emirates is still

committing fraud on pilot duty times on each and every flight, which includes City Pair flights.

### i. Violation of Layover Duration Requirement in Washington Dulles, EK 231, EK 232 (a GSA city pair contract route)

58. The current layover duration of 24:45 in Dulles for the Washington-Dulles to Dubai CPP flight is in direct violation of OM-A 7.2c. Operations Manual Part A (OM-A) 7.2 requires crew rest of at least 18 hours following certain flights, such as the Washington-Dulles to Dubai flight. "The avoidance of the scheduling rest periods of between 18 and 30 hours especially after long flights crossing many time zones."

59. The reason being that it is impossible to properly sleep twice in that 18 to 30-hour bracket which leads to fatigue on the 13 plus hour return flight to Dubai.

60. A significant percentage of Emirates pilots are forced to operate in violation of these rules and their subsequent fatigue is representing a clear and present danger to flight safety. The fraud is systematic and intentional by Emirates Airline management.

61. The fraudulent misrepresentation of check-in times for each and every flight leads to intentional understatement of individual flight duty times. Hence Emirates pilots are conducting flights that are violating OM-A 7.6.2 (supra),7.9.3. (supra), and OM-A Annex 7.E.3 (formerly 7.C.3). The underreporting of duty times also leads to duties conducted when legally the pilot should still be enjoying a curfew from duty, since rest requirements are based on previous and subsequent flight duty duration and timings.

62. The false reporting of Flight Duty times leads to a violation of the Limits on Maximum Duty Hours for the periods of 7, 14 and 28 days. OM-A 7.19 (supra).

63. The legal records required are all falsified because the beginning and duration of the duty times do not represent the truth, OM-A 7.22 (supra).

64. The rostering provisions for Ultra Long Range Operations, flights above 14 hours, are also violated in the same way as outlined above for other flights. OM-A Annex 7.E.3 (formerly 7.C.3).

65. The OM-A allows several exceptions from Duty Time Limits in the Annex section of the OM-A. However, all of those exceptions are still fraudulent flights because the check-in times are still manipulated as described above on other flights.

66. The requirements for Days Off and Local Nights are violated by early starts that are not reported as such, OM-A 7.18.1 (supra).

67. The cumulative effect of these violations leads to not only false billing and false certification of compliance with the contract requirements on the CPP GSA flights, but also dangerous levels of fatigue for many Emirates Airline pilots.

### ii.    The illegal scheme also violates FAA regulations

68. Emirates Airline deliberately commits fraud by misrepresenting pilots' Report Times. This fraud is material in the light of US Federal Regulation Part 117. Emirates Airline has deliberately covered up these violations. Many violations of Part 117 would be avoided by the false check-in times and by the underreported Flight Duty Periods. Emirates Airline violates the regulations set forth in FAA Regulations §117.3, §117.11(a), §117.13(a), §117.17(a), §117.23(b) and §117.25(b).

69. US regulations are more stringent than GCAA regulations, especially when it comes to night flying and the effects of the window of circadian low.

70. Based on the FAA definitions of report time and flight duty period, Emirates has been recording false Report Times for every pilot on every flight. As a consequence, all Flight Duty Periods are underreported. Flight duty period means a period that begins when a flight crew member is required to report for duty with the intention of conducting a flight, a series of flights, or positioning or ferrying flights, and ends when the aircraft is parked after the last flight and there is no intention for further aircraft movement by the same flight crew member. A flight duty period includes the duties performed by the flight crew member on behalf of the certificate holder that occur before a flight segment or between flight segments without a required intervening rest period. Report time means the time that the certificate holder requires a flight crew member to report for an assignment. 14 C.F.R. §117.3.

71. Emirates had the manufacturer deviate from standard design and changed the location of the Crew Rest facilities on their Airbus A 380 fleet, which are used on the City Pair Program flights, to an aft location that is not isolated from noise from the Economy Passengers. As multiple Air Safety Reports demonstrate, this Rest Facility on the A 380 fleet does not provide isolation from noise and disturbance. It does not meet the requirements of a Class 1 Rest Facility as defined in 14 C.F.R. §117.3: Class 1 rest facility means a bunk or other surface that allows for a flat sleeping position and is located separate from both the flight deck and passenger cabin in an area that is temperature-controlled, allows the flight crew member to control light, and provides isolation from noise and disturbance. The non-compliance with Class 1 Crew Rest Facility requirements of the Emirates Airbus A 380 fleet also makes the factoring of Flight Time on augmented flights even more aggregious.

20

72. Emirates is operating flights that exceed the limits of 14 C.F.R. §117.11(a), which requires
that no certificate holder may schedule and no flight crew member may accept an assignment
or continue an assigned flight duty period if the total flight time:

(1) Will exceed the limits specified in Table A of this part if the operation is conducted
with the minimum required flight crew.

Table A to Part 117—Maximum Flight Time Limits for Unaugmented Operations Table

| Time of report (acclimated) | Maximum Flight time (hours) |
|---|---|
| 0000-0459 | 8 |
| 0500-1959 | 9 |
| 2000-2359 | 8 |

This violation affects the GSA City Pair route from Milan to New York during the winter season
along with several other routes:

| | Local Time of Departure | Flight Time | Number of Flight Crew | §117.11(a) Limit of Flight Time |
|---|---|---|---|---|
| EK356, DXB-CGK | 04:25 | 08:15 | 2 | 08:00 §117.11(a)(1) |
| EK241, DXB-YYZ | 09:55 | 14:30 (Winter) 14:00 (Summer) | 3 | 13:00 §117.11(a)(2) |
| EK449, AKL-DXB | 21:15 (Winter) 20:30 (Summer) | 17:25 (Winter) 17:05 (Summer) | 4 | 17:00 §117.11(a)(3) |
| EK205, MXP-JFK (GSA city pair) | 15:40 (Winter) 16:10 (Summer) | 9:20 (Winter) 8:50 (Summer) | 2 | 09:00 §117.11(a)(1) |

73. Emirates is violating the Flight Duty Period limitations set in 14 C.F.R. §117.13, which
requires in part, no certificate holder may assign and no flightcrew member may accept an
assignment for an unaugmented flight operation if the scheduled flight duty period will
exceed the limits in Table B of this part.

Table B to Part 117—Flight Duty Period: Unaugmented Operations

| Scheduled time of start (acclimated time) | Maximum flight duty period (hours) for lineholders based on number of flight segments | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7+ |
| 0000-0459 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| 0400-0459 | 10 | 10 | 10 | 10 | 9 | 9 | 9 |
| 0500-0559 | 12 | 12 | 12 | 12 | 11.5 | 11 | 10.5 |
| 0600-0659 | 13 | 13 | 12 | 12 | 11.5 | 11 | 10.5 |
| 0700-1159 | 14 | 14 | 13 | 13 | 12.5 | 12 | 11.5 |
| 1200-1259 | 13 | 13 | 13 | 13 | 12.5 | 12 | 11.5 |
| 1300-1659 | 12 | 12 | 12 | 12 | 11.5 | 11 | 10.5 |
| 1700-2159 | 12 | 12 | 11 | 11 | 10 | | |
| 0210-2259 | 11 | 11 | 11 | 10 | | | |
| 2200-2259 | 11 | 10 | 11 | 11 | | | |

74. The deliberate recording of false Report Times leads directly to fraudulent underreporting of

    Flight Duty Periods. See the following examples:

| | EK021<br>DXB-MAN | EK354<br>DXB-SIN | EK 356<br>DXB-CGK |
|---|---|---|---|
| Local Time of Departure | 03:00 | 03:30 | 04:25 |
| Flight Time | 08:00 (Winter)<br>07:50 (Summer) | 07:30 | 08:15 |
| Number of Flight Crew | 2 | 2 | 2 |
| §117.13(a) FDP limit | 09:00 | 09:00 | 09:00 |
| false FDP reported by EK until July-31-2016 | 09:00 (Winter)<br>08:50 (Summer) | 08:30 | 09:15 |
| false FDP reported by EK after July-31-2016 | 09:25 (Winter)<br>09:15 (Summer) | 08:55 | 09:40 |
| Actual FDP | 09:45 (Winter)<br>09:35 (Summer) | 09:15 | 10:00 |

75. Emirates is violating the Flight Duty Period (FDP) limitations set in §117.17(a), which

    requires that for flight operations conducted with an acclimated augmented flight crew, no

    certificate holder may assign and no flight crew member may accept an assignment if the

    scheduled flight duty period will exceed the limits specified in Table C of this part.

Table C to Part 117—Flight Duty Period: Augmented Operations

| | Maximum flight duty period (hours) based on rest facility and number of pilots | | | | | |
|---|---|---|---|---|---|---|
| | Class 1<br>rest facility | | Class 2<br>rest facility | | Class 3<br>rest facility | |
| Scheduled time of start (acclimated time) | 3 pilots | 4 pilots | 3 pilots | 4 pilots | 3 pilots | 4 pilots |
| 0000-0559 | 15 | 17 | 14 | 15.5 | 13 | 13.5 |
| 0600-0659 | 16 | 18.5 | 15 | 16.5 | 14 | 14.5 |
| 0700-1259 | 17 | 19 | 16.5 | 18 | 15 | 15.5 |
| 1300-1659 | 16 | 18.5 | 15 | 16.5 | 14 | 14.5 |
| 1700-2359 | 15 | 17 | 14 | 15.5 | 13 | 13.5 |

76. The deliberate recording of false Report Times leads directly to fraudulent underreporting of Flight Duty Periods. The violations are even more frequent and more severe if one considers the Crew Rest Facility of the Emirates A 380 fleet to be Class 2 instead of Class 1, see comments for §117.3. Flight Duty Period limitations for Class 2 Crew Rest Facility are indicated in brackets (*). See the following examples:

| | EK218 LAX-DXB | EK221 DXB-DFW | EK219 DXB-MCO | EK213 DXB-FLL | EK449 AKL-DXB |
|---|---|---|---|---|---|
| Local Time of Departure | 21:30 (Winter) 22:40(Summer) | 02:50 | 02:50 | 03:30 (Winter) 03:00(Summer) | 21:15 (Winter) 20:30(Summer) |
| Flight Time | 16:00 (Winter) 15:50(Summer) | 16:15 (Winter) 16:00(Summer) | 16:20 (Winter) 15:50(Summer) | 16:25 (Winter) 15:55(Summer) | 17:25 (Winter) 17:05(Summer) |
| Number of Flight Crew | 4 | 4 | 4 | 4 | 4 |
| §117.17(a) FDP limit | 17:00 | 17:00 | 17:00 | 17:00 | 17:00 (15:30*) |
| false FDP reported by EK until July-31-2016 | 17:00 (Winter) 16:50(Summer) | 17:15 (Winter) 17:00(Summer) | 17:20(Winter) 16:50(Summer) | N/A | 18:25 (Winter) 18:05(Summer) |
| false FDP reported by EK after July-31-2016 | as before 17:00 (Winter) 16:50(Summer) | 17:40 (Winter) 17:25(Summer) | 17:45 (Winter) 17:15(Summer) | 17:50 (Winter) 17:20(Summer) | as before 18:25 (Winter) 18:05(Summer) |
| Actual FDP | 17:45 (Winter) 17:35(Summer) | 18:00 (Winter) 17:45(Summer) | 18:05 (Winter) 17:35(Summer) | 18:10 (Winter) 17:40(Summer) | 19:10 (Winter) 18:50(Summer) |

77. Emirates Airline is scheduling its pilots to exceed the limitations of §117.23(b), which requires that no certificate holder may schedule and no flight crew member may accept an assignment if the flight crew member's total flight time will exceed the following: (1) 100

hours in any 672 consecutive hours or (2) 1,000 hours in any 365 consecutive calendar day period.

78. The fraudulent underreporting of Flight Duty Periods delivers high pilot productivity and compressed duty rosters for the airline. Due to the Emirates specific factoring of flight time on augmented flights, Emirates pilots easily exceed the limitations set forth here. For example, on a 16:00h flight from SFO to DXB, a credit of only 7:30h flight time is given to the augmenting crew when they should have recieved 16:00h. Some Emirates pilots fly 1,200 hours in 365 consecutive calendar days.

79. While the factoring of augmented flights is permitted for Emirates Airline by the GCAA it is still a fraudulent certification of requirements with the contracts due to the non-compliance with Class 1 Crew Rest Facility requirements of the Emirates Airbus A 380 fleet discussed above.

80. Emirates Airline is scheduling many of its pilots to operate with minimum rest. Due to the fraudulent misrepresentation of Report Times, pilots are sometimes forced to report early for duty when they are still entitled to rest. The minimum rest requirement of 14 C.F.R. §117.25(b) is violated, which requires that before beginning any reserve or flight duty period a flight crew member must be given at least 30 consecutive hours free from all duty within the past 168 consecutive hour period.

81. In sum, when JetBlue and Emirates submitted their joint bid to operate these CPP routes, they were required to verify and confirm compliance with GCAA and/or FAA regulations. As described above, Emirates intentionally falsified the duty hours of its pilots to make it appear as though its pilots were properly rested. These falsifications are violations of both GCAA and FAA requirements and regulations. Had the United States and the FAA been

aware of Emirates' false duty reporting times, it would not have awarded these flights to Emirates.

## VI. CLAIMS FOR RELIEF

### COUNT 1.        FALSE CLAIMS- 31 U.S.C. §3729(a)(1)(A)

82. The allegations of all preceding paragraphs in this Complaint are hereby incorporated by reference.

83. By virtue of the acts described above, Defendant violated the FCA by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

84. Defendant knowingly and/or recklessly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A). Defendant represented, warranted and/or certified, expressly and/or impliedly, to the United States that they were: fully compliant with all federal laws, including but not limited to, certifying their compliance with all of the requirements of the contract when they knowingly and/or recklessly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval.

85. By reason of the Defendant's conduct, the United States has been damaged, and continues to be damaged, in an amount equal to entire amount paid by the Government to Defendant on every contract that Defendant fraudulently induced the Government into by making false claims about their compliance with the contract.

### COUNT 2.        FALSE STATEMENTS- 31 U.S.C. §3729(a)(1)(B)

86. The allegations of all preceding paragraphs in this Complaint are hereby incorporated by reference.

87. In performing the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(l)(B). Defendant represented, warranted and/or certified, expressly and/or impliedly, to the United States that they were fully compliant with all federal laws. Based upon the Defendant's false representations, the United States paid for fraudulent claims.

88. By reason of the Defendant's conduct, the United States has been damaged, and continues to be damaged, in an amount equal to entire amount paid by the Government to Defendant on every payment that Defendant fraudulently induced the Government into by making false claims about their compliance with the contract.

### COUNT 3.    REVERSE FALSE CLAIMS 31 U.S.C. §3729(a)(1)(G)

89. The allegations of all preceding paragraphs in this Complaint are hereby incorporated by reference.

90. In performing the acts described above, Defendant was able to receive payments from the government based upon their false certifications of compliance with the contracts. The Defendant retained these payments to which they were not entitled to and knowingly used false records and statements to conceal the obligation to reimburse the federal Government for monies improperly retained, in violation of 31 U.S.C. §3729(a)(l)(G). Defendant represented, warranted and/or certified, expressly and/or impliedly, to the United States that they were fully compliant with all federal laws.

91. Through Defendant's actions of improperly retaining funds to which they are not entitled, the United States has been deprived of the use of these monies and is entitled to recover damages in amounts to be determined at trial.

**COUNT 4.       BREACH OF CONTRACT**

92. Relator re-alleges and incorporates by reference the allegations made in this Complaint.

93. As set forth above, Defendant did not provide U.S. Government with completed contracted services at the prices identified through the contracts.

94. As set forth above, Defendant charged U.S. Government for services for which it did not substantially perform under the contract.

95. Accordingly, Defendant breached their obligations under the contracts.

96. Defendant's breach of their obligations under the contracts has proximately caused reasonably foreseeable damages to U.S. Government.

97. As a result of Defendant's wrongful conduct, U.S. Government has suffered damages in an amount to be determined at trial.

**COUNT 5.       FRAUD**

98. Relator re-alleges and incorporates by reference the allegations made in this Complaint.

99. Through the acts described above, Defendant made misrepresentations and omissions of material fact concerning performance of the contract to the U.S. Government under the contracts.

100.    Defendant made these misrepresentations and omissions of material fact with knowledge of their falsity and/or with reckless disregard for their truth.

101.    Defendant made these misrepresentations and omissions of material fact intending that U.S. Government, directly or indirectly, would rely on their accuracy in beginning or continuing to do business with Defendant.

102.    U.S. Government justifiably relied on these misrepresentations and omissions of material fact sold to it under the contracts.

103.   As a result of Defendant's wrongful conduct, the U.S. Government has suffered damages in an amount to be determined at trial.

104.   In addition to compensatory damages, given Defendant's bad faith and/or malicious, willful, reckless, wanton, or fraudulent conduct, U.S. Government is entitled to recover punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, the United States of America, through Relators Meinberger and Weber, requests the Court for entry of judgment against Defendant and the following relief:

A. Defendant cease and desist from further violations of the False Claims Act, 31 U.S.C. § 3729 et seq.;

B. For violations of the Federal False Claims Act, 31 U.S.C. §3729, et seq., this Court enter Judgment against the Defendant, in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus the maximum statutory civil penalty for each action in violation of the FCA, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

C. Pursuant to section 3730(d) of the False Claims Act, that the Relators be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages allowed under applicable law;

D. That the Relators be awarded all costs of this action, together with all expert witness fees, attorneys' fees, and court costs, as fully as is allowed by law pursuant to 31 U.S.C. § 3730(d); and

E. That the United States Government and Relators Meinberger and Weber, receive all relief, both in law and in equity, to which they may reasonably appear entitled to.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, a jury trial is demanded.

Respectfully submitted on this 13th day of April 2017.

*David Weber*

DAVID P. WEBER #468260
RICHARD J. LINK #443609
GOODWIN WEBER PLLC
267 Kentlands Blvd., Suite 250
Gaithersburg, MD 20878
(301) 850-3370
FAX (301) 850-3374
david.weber@goodwinweberlaw.com
richard.link@goodwinweberlaw.com
Attorneys for Plaintiff Relators

By: MAHANY LAW
/s/ Brian H. Mahany
Brian H. Mahany
Mahany Law
P.O. Box 511328
Milwaukee WI 53203
(414) 258-2375 Phone
(414) 777-0776 Fax
brian@mahanylaw.com
Attorney for Plaintiff Relators
*Pro Hac Vice Anticipated*

```
Court Name: District of Columbia
Division: 1
Receipt Number: 4616083994
Cashier ID: kpadilla
Transaction Date: 04/13/2017
Payer Name: GOODWIN WEBER PLLC
-----------------------------------
CIVIL FILING FEE
 For: GOODWIN WEBER PLLC
 Amount:        $400.00
-----------------------------------
CREDIT CARD
 Amt Tendered:  $400.00
-----------------------------------
Total Due:      $400.00
Total Tendered: $400.00
Change Amt:     $0.00

17-655

Only when the bank clears the
check, money order, or verifies
credit of funds, is the fee or debt
officially paid or discharged.  A
$53 fee will be charged for a
returned check.
```

US DISTRICT COURT, DC
333 CONSTITUTION AVE NW
WASHINGTON, DC 20001
(202) 354-3102

## SALE

Server #: 000001
MID: 000014137349
TID: 003              REF#: 00000778
Bank ID: 1340
Batch #: 103001      RRN: 250100002
04/13/17                   15:05:57
APPR CODE: 03736G
VISA                       Swiped
*************0807             **/**

**AMOUNT**        **$400.00**

APPROVED

CUSTOMER COPY